IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DIANE ROSETSKY                    :  CIVIL ACTION
                                  :
          v.                      :
                                  :
NATIONAL BOARD OF MEDICAL         :
EXAMINERS OF THE UNITED STATES    :
OF AMERICA                        :  NO. 07-3167

ORDER

AND NOW, this 19th day of February, 2008, upon

consideration of defendant National Board of Medical Examiners of

the United States of America's ("NBME") motion for summary

judgment (docket entry #14), plaintiff's response, and the Court

finding:

(a)  Plaintiff Diane Rosetsky sued NBME for age

discrimination under the Age Discrimination in Employment Act

("ADEA"), 29 U.S.C. § 621, et seq., and the Pennsylvania Human

Relations Act, 43 Pa. Cons. Stat. Ann. § 951, et seq ("PHRA");

NBME moved for summary judgment[1] on all claims, and we shall

---

[1]Summary judgment is appropriate if there is no genuine
issue of material fact and the moving party is entitled to
judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In ruling
on a motion for summary judgment, the Court must view the
evidence, and make all reasonable inferences from the evidence,
in the light most favorable to the nonmoving party.  Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  Whenever a
factual issue arises which cannot be resolved without a
credibility determination, at this stage the Court must credit
the non-moving party's evidence over that presented by the moving
party.  Liberty Lobby, 477 U.S. at 255.

grant its motion;

(b)   On September 27, 2005, NBME hired Rosetsky, then forty-seven years old, as a temporary Test Development Associate I; on December 19, 2005, NBME took her on full-time as a Test Development Program Assistant; at all times she was an at-will employee, Def.'s Mem. Ex. 1, 2; while employed at NBME, Rosetsky's direct supervisor was Katherine Holtzman;

(c)   NBME maintains Role Profiles which consist of lists of job duties associated with the various positions at NBME; a Test Development Program Assistant Role Profile contains

---

The moving party bears the initial burden of proving that there is no genuine issue of material fact in dispute. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585 n.10 (1986). Once the moving party carries this burden, the nonmoving party must "come forward with 'specific facts showing there is a genuine issue for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The non-moving party must present something more than mere allegations, general denials, vague statements, or suspicions. Trap Rock Indus., Inc. v. Local 825, 982 F.2d 884, 890 (3d Cir. 1992); Fireman's Ins. Co. of Newark v. DuFresne, 676 F.2d 965, 969 (3d Cir.1982). It is not enough to discredit the moving party's evidence, the non-moving party is required to "present affirmative evidence in order to defeat a properly supported motion for summary judgment." Liberty Lobby, 477 U.S. at 257 (emphasis in original). A proper motion for summary judgment will not be defeated by merely colorable or insignificantly probative evidence. See Liberty Lobby, 477 U.S. at 249-50.  Also, If the non-moving party has the burden of proof at trial, then that party must establish the existence of each element on which it bears the burden. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

a variety of duties, including building and maintaining
databases, assisting with implementation of new technology,
tracking and compiling budgets and other materials, assisting
with quality assurance, creating, updating, and disseminating
documentation, and "[i]dentify[ing]
training/documentation/support needs, provid[ing] status reports,
project planning," Pl.'s Mem. Ex. C at 951-52;

     (d)  Rosetsky testified that NBME assigned her tasks
that were consistent with the job duties listed in the Role
Profile, but that she was also asked to do clerical work for
Holtzman and other supervisors, e.g., photocopying, proofreading,
Def.'s Mem. Ex. 8 [hereinafter Pl.'s Dep.] at 77-79, 94-95 101-
02, 104, Ex. 14; in general, Rosetsky testified that she did
"[w]hatever Kathy [Holtzman] asked me to do," id. at 94;

     (e)  Rosetsky had no problem with Holtzman until about
September of 2006, Pl.'s Dep. at 83, 85;

     (f)  On September 19, 2006, Rosetsky expressed interest
in the position of Test Development Associate I, Special
Projects, which had recently opened up because Kieren Hussie, who
held the position and was under forty, had been promoted, Def.'s
Mem. at Ex. 16; Pl.'s Dep. 123;

     (g)  Rosetsky formally applied for the Test Development

Associate position as well as a Case Developer position on
October 18 and October 20, 2006, respectively, Def.'s Mem. at Ex.
16; but she then withdrew both applications on November 6, 2006
because she felt that Holtzman would prevent her from getting the
job, id; Pl.'s Dep. 287-88; in an October 23, 2008 email,
Rosetsky wrote to Holtzman,

> I showed my resume to Krista and Kathy
> Angelucci, hoping that I could move into the
> Test Development Associate position that was
> opened.  For this you insulted me, insisting
> I was 'bragging' about how smart I was, that
> I had a Master's degree and formal computer
> training, etc.  Maybe you do have a problem
> with my advanced education and skills.  As
> far as your insistence that Kathy Angelucci
> does the hiring...everyone knows [that] you
> control everything that happens in this
> department.

Id. Ex.18;

(h)  In October of 2006, Rosetsky was asked by a co-
worker to edit hundreds of tutorial slides; after she had
finished the task, Holtzman found out about Rosetsky's editing,
became angry with her, and apparently told Rosetsky that all she
was supposed to do was "cut and paste" other people's edits; then
Holtzman re-edited Rosetsky's work, Pl.'s Dep. at 103-04, Def.'s
Mem. 18;

(i)  On October 18, 2006, Rosetsky went to see Barbara

Davidson, the Director of Human Resources, to complain that
Holtzman re-edited her work and would not let anyone use her
edits, id. at 103-04, 265;

(j)  The next day, Rosetsky met with Davidson again to
express frustration with the way Holtzman was treating her and
that she was not getting work that made proper use of her
abilities, Def.'s Mem. Ex. 19;

(k)  Rosetsky testified that during these meetings with
Davidson, she specifically stated that she believed that
Holtzman's actions were motivated by age discrimination; Rosetsky
also testified that she told her co-workers Faith Balsama and
Debbie Shelmire that "We're the older women here, and that's why
we're kept in these positions," Pl.'s Dep. at 306;

(l)  On October 22, 2006, Holtzman sent Rosetsky an
email about her responsibilities during the tutorial slide
editing project; Holtzman wrote, "you have misconstrued your role
in this project [which] was and is to provide support for the
team.  It was never my intention for you to play a lead role...I
was actually hoping that you could streamline the correction
process by doing the cut and paste work...[but] you seemed to
have the impression that you would be doing the editing...it
seemed reasonable to let you try your hand at this...[but no]

matter who did the initial editing, I was going to have to look
through the work and make the final decisions about wording,"
Def.'s Mem. Ex. 18;

       (m)  Early the next morning, Rosetsky responded,

> I never expected you to use [the edits]
> without changes, however, you completely
> ignored them.  I still think they were
> skillfully and professionally done.  But I
> don't think this is the real issue here.  The
> real issue is -- that I have reviewed most of
> the emails between you and I over the last
> year.  They primarily consist of your
> requests to me to: print out files and put
> them on your chair, xerox articles and put
> them in your office, cut and paste in various
> word files, to file or keep track of various
> documents, and punching holes in final
> reports.  None of the assignments have been
> appropriate for my skills, education and
> technological background -- and frankly, have
> been insulting.

Id;

       (n)  Rosetsky forwarded the email chain containing the
excerpt above to Davidson, noting that "it was time to confront
my treatment here -- because at this point I feel I have nothing
to lose," id;

       (o)  Rosetsky apparently attempted to talk with
Holtzman about these issues, but she was rebuffed, Pl.'s Dep. at
261;

       (p)  On October 26, 2006, Holtzman also contacted Human

Resources for help with dealing with Rosetsky, Def.'s Mem. Ex. 20; after this, apparently Holtzman offered to meet, but they never did, Pl.'s Dep. at 261;

(q)  The same day, Holtzman assigned Rosetsky to two database projects, Def.'s Mem. Ex. 22;

(r)  Four days later, Holtzman directed Rosetsky to "keep a record of what you are working on each day and send me the list each Friday;" and after Rosetsky gave her a breakdown of her activities on a particular project, Holtzman reiterated that "from here on out please account for you [sic] time on a daily basis by project;" Holtzman explained that "It is good to know the amount of time spent on a project so that we can use the information to make decisions about whether to continue development and/or projecyt [sic] time required for development of similar projects in the future," id. Ex. 23;

(s)  On November 5, 2006, Holtzman emailed Human Resources to air her grievances about Rosetsky; in particular, Holtzman noted that Rosetsky had failed to provide work summaries and status reports as requested, and was speaking to other people in the department about her problems with Holtzman, Def.'s Mem. Ex. 24;

(t)  Two days later, Davidson met with Rosetsky and

7

Holtzman to discuss their workplace problems; after this meeting, Holtzman emailed Rosetsky, stating that she should "immediately stop...sharing frustrations about your work assignments, interpersonal relationship with me, or other observations regarding Test Development management" with anyone; instead, Rosetsky was to "schedule a meeting with me to discuss issues that arise.  If you believe I am not being responsive, it would also be appropriate for the next step to be a meeting with David Swanson.  At any time, you should feel comfortable to discuss concerns with Human Resources," Def.'s Mem. Ex. 25; but Rosetsky continued to discuss her problems with Holtzman with her co-worker, Faith Balsama, id. Ex. 27;

(u)  In the same email Holtzman also directed Rosetsky to provide her with various reports on ongoing projects, Def.'s Mem. Ex. 25;

(v)  On November 8, 2006, Rosetsky emailed Davidson requesting to be placed under a different supervisor and to have her cubicle moved because Holtzman continued to belittle Rosetsky and give her clerical work, id. Ex. 26;

(w)  The next day, Rosetsky again emailed Davidson to complain about Holtzman's "lack of people skills and willingness to say anything necessary to get her way" and that "[t]his [was]

8

retaliatory harrassment [sic] for my involving [Human Resources];" Davidson told Rosetsky that they could talk next week but that Rosetsky should concentrate on getting her work done and was spending "too much time focusing on this conflict;" Rosetsky replied that she had been doing her work but Holtzman had been interrupting her "with lengthy e-mails- and requests for project plans for things that I have already completed or am in the midst of- which she ignored for the whole year," id. Ex. 28;

(x)  On November 9, 2006, Rosetsky used NBME's Values Hotline to lodge a complaint about Holtzman in which Rosetsky stated that after her November 7, 2006 meeting with Holtzman and Davidson, Holtzman "proceeded to call my co-workers into her office to coerce them into making negative statements about me...[s]he then tried to turn a situation which involved her mistreatment of me, into a disciplinary action for me, telling me to 'stay in my seat' and 'not talk to anyone'...[and] make a chart and give her a minute to minute recording of what I do during the day...if I did not comply, she was going to issue a formal 'Performance Plan' for me," id. Ex. 30;

(y)  On November 13, 2006, Rosetsky forwarded excerpts of an email by Holtzman to Davidson, pointing out that Holtzman had required Rosetsky to not discuss their problems with others

at NBME, to keep a daily log of time spent on projects to be sent to Holtzman by Friday's end of business, and to direct all questions to Holtzman or others in a "nonconfrontational manner," id. Ex. 31;

(z)  The next day, Holtzman sent another email in which she reprimanded Rosetsky for failing to send Holtzman her daily logs, and again requested those logs for the previous two weeks, id;

(aa) Rosetsky responded, copying Davidson on the email, "I was planning to discuss with HR how I am being singled out to do this - I believe, in retaliation for my coming to them for assistance...Your 'warning' to me that you will put a performance plan in place- I also take that as retaliation - in as far as there has been nothing wrong with my work performance," id;

(bb) On November 16, 2006, Rosetsky and Holtzman had a conversation in which they discussed potentially moving Rosetsky to a different position; later that day, Rosetsky emailed Holtzman,

> You told me that the way NBME works I would have to start as a 'Production Assistant' and work my way up.  I am concerned that my 10 years of work experience and my education are not being taken into account.  It appears that other people, some younger and with less education and experience, are being hired

> into the organization in positions that are
> higher than Production Assistant...Some are
> being promoted without having to apply for
> position...I would appreciate a more specific
> explanation as to why I am not qualified in
> your department for any other position other
> than Program or Production Assistant.

Id. Ex. 32;

(cc) Holtzman replied, "I suggest you focus on performing your current role well so that you can be considered a strong candidate for other roles.  Once you have done that consistently and successfully, I will be happy to discuss your career development," id;

(dd) On November 21, 2006, Holtzman and Davidson presented Rosetsky with her year end performance review, in which Rosetsky received a rating of "satisfactory," id. Ex. 35;

(ee) The performance review was partly compiled from comments by NBME staff who had worked with Rosetsky; Holtzman had requested and received comments from co-workers regarding Rosetsky in October of 2006; all those who commented substantively on Rosetsky's performance lauded her technical abilities but many faulted her interpersonal skills, id. Ex. 34;

(ff) In the performance review, Holtzman noted that Rosetsky had "excellent technical skills" and was "willing to share her knowledge with others," but that Holtzman worried that

Rosetsky was "more interested in spending her time solving the

technical challenges posed by the project without considering

whether the application will be used broadly enough to justify

the time she is investing;" furthermore, Holtzman stated that

Rosetsky

> became confrontational and unprofessional in
> regard to dealing with her frustration about
> working on [the tutorial slides project] in a
> support role...Her communication has become
> more and more negative over the past few
> weeks, and despite constant reminders, she
> has continued to vent her frustrations and
> complaints to others inside and outside the
> unit...[creating] an uncomfortable and
> nonproductive work environment...If she
> continues to object to performing the duties
> within her job description and to disrupt the
> work environment...she will be subject to
> disciplinary action up to and including
> termination.

Id. Ex. 35;

(gg) Rosetsky, Holtzman, and Davidson were supposed to

meet and discuss the performance review, but Rosetsky declined;

she stated, "I am not going to sit and listen to some unethical

example of the Peter Principle tell lies about me," id. Ex. 37;

(hh) That same day, Rosetsky filed another complaint

about Holtzman through the NBME Values Hotline; in this

complaint, Rosetsky stated,

> Kathy is continually disrespectful to me to

12

> the point of making faces at me if I walk in
> her office...She has not given me any work to
> do other than clerical work- which is way
> below my skill level- I believe to belittle
> me.  She has showed resent [sic] at my
> attempts to be innovative for the
> department...Finally Kathy gave me a
> performance review which was very disturbing
> to me...She has called my co-workers into her
> office and tried to get them to write down
> negative things about me.  She instructs
> others not to talk to me - and has told me to
> 'stay in my seat and not talk to anyone.'

Id. Ex. 30;

> (ii) On November 22, 2006, Rosetsky emailed Holtzman,

> Since I received so much negative feedback
> about the databases that I built and created,
> and as in your words, I was not hired to do
> this, I am not going to complete any further
> work on them.  This will avoid another poor
> performance rating for me in the future -- as
> you lack the qualifications to evaluate my
> skills in this area...if you would like me to
> continue my innovative work, I expect to be
> compensated for this level of performance.
> This would require a change to an information
> technology type-title, at a salary of at
> least $60,000.

Id. Ex.38;

(jj) On November 27, 2006, Davidson sent a letter to
Rosetsky terminating her effective December 1, 2006, because
"[y]our communications to your supervisor and me over the past
few weeks make it clear that you are not interested in performing
the duties of Program Assistant as defined by the NBME.  The job

13

that you proposed in your email of November 22, 2006, is not
available and will not be offered to you," id. Ex. 39;

(kk) Rosetsky claims that through Holtzman's and
Davidson's actions, NBME discriminated against her on the basis
of age, violating 29 U.S.C. § 623(a) and 43 Pa. Cons. Stat. Ann.
§ 955, and then retaliated against her when she complained about
it, violating 29 U.S.C. § 623(d);

(ll) Since Rosetsky does not have direct evidence of
discrimination and relies on circumstantial evidence, we must
apply the burden shifting analysis from McDonnell-Douglas Corp.
v. Green, 411 U.S. 792 (1973) and Texas Dep't of Cmty. Affairs v.
Burdine, 450 U.S. 248 (1981);[2]

(mm) We now consider each claim in turn;

(nn) Rosetsky asserted that she was discriminated
against on the basis of age because Holtzman reduced her

---

[2]Under this approach, the plaintiff must first prove a prima
facie case of discrimination.  McDonnell-Douglas, 411 U.S. at
802; St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993).
If the plaintiff succeeds, then the burden shifts to the
defendant to "articulate some legitimate, non-discriminatory
reason for the [adverse employment action.]" McDonnell-Douglas at
802.  Then the burden shifts back to the plaintiff to show the
reason proffered is a pretext for discrimination.  Id. at 804.
   The ADEA and PHRA claims are coextensive and subject to the
McDonnell-Douglas burden-shifting analysis. Tomasso v. Boeing
Co., 445 F.3d 702, 704 (3d Cir. 2006); Kelly v. Drexel Univ., 94
F.3d 102, 105 (3d Cir. 1996).

responsibilities, giving her demeaning clerical work to do, while she gave other, younger employees more substantive projects and promotions, Def. Mem. at 4-7;

(oo) To establish a <u>prima</u> <u>facie</u> age discrimination claim under the ADEA, a plaintiff must show that she (1) is at least forty years old, (2) qualified for the position, (3) subject to an adverse employment action and that (4) the circumstances of the adverse action permit an inference of discriminatory action, <u>see</u> <u>Anderson v. Consolidated Rail Corp.</u>, 297 F.3d 242, 249 (3d Cir. 2002);

(pp) NBME argues that Rosetsky cannot establish the prima facie case for age discrimination because Holtzman's directives to do clerical work do not amount to an adverse employment action;

(qq) An adverse employment action involves "a significant change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision causing a significant change in benefits," <u>Weston v. Pennsylvania</u>, 251 F.3d 420, 430-31 (3d Cir. 2001);

(rr) Rosetsky contends that Holtzman's "failing to provide [her] with job assignments which matched her job Role Profile [was] an adverse employment action against [Rosetsky],"

Pl.'s Mem. at 4; but the Role Profile stated that her responsibilities included "identify[ing] training/documentation/ support needs" specifically of the Director of Test Development, i.e., Holtzman, Pl.'s Mem. Ex. C at 952; identifying Holtzman's support needs must include clerical work; furthermore, not all of the tasks that Holtzman assigned her were clerical in nature, Def.'s Mem. Ex. 18 (permitting Rosetsky to take the first shot at editing the tutorial slides); Def.'s Mem. Ex. 22 (assigning her two database projects); Holtzman's decision to assign Rosetsky clerical work does not involve "a significant change in employment status" because none of Rosetsky's wages, benefits, or perquisites were affected as part of those assignment; she obviously did not like the work she was given by her supervisor, but the assignment of what she regarded as scut work, in and of itself, cannot be an adverse employment action within the ADEA's ambit;

(ss) Even assuming that assigning of clerical work to Rosetsky was an adverse employment action, Rosetsky cannot establish the prima facie case because she cannot establish facts sufficient to permit an inference of age discrimination;

(tt) When the plaintiff cannot present direct evidence of age discrimination, it is common practice to establish the

16

fourth prong of the prima facie test by showing that similarly situated, younger employees were treated differently by the employer, <u>Anderson</u>, 297 F.3d at 249;

(uu) Rosetsky testified that other employees both older and younger performed clerical work, Pl.'s Dep. at 81-83; she cannot point to any circumstances that suggest that Holtzman's assigning such work to Rosetsky was motivated by Rosetsky's age; indeed, there is no individual she can point to who is similarly situated to whom Holtzman could have but did not assign such work;

(vv) Therefore, Rosetsky fails to establish the third and fourth prongs of the <u>prima facie</u> case for age discrimination, and we will grant summary judgment against this claim;

(ww) Rosetsky also asserted a retaliation claim against NBME, alleging that NBME terminated her because she complained about Holtzman's alleged age discrimination;

(xx) To establish a <u>prima facie</u> case for retaliation under the ADEA, a plaintiff must show she was (1) engaged in a statutorily protected activity, and (2) suffered an adverse employment action that was (3) causally connected to her protected activity, <u>Shaner v. Synthes</u>, 204 F.3d 494, 500-01 (3d Cir. 2000);

17

(yy) Rosetsky can establish the prima facie case for retaliation; she testified that when she went to meet with Davidson she repeatedly told her she believed that she was being discriminated against on the basis of her age, Pl.'s Dep. at 306; it was as the flurry of complaints and recriminations between Rosetsky and Holtzman reached their zenith that Rosetsky was finally discharged, Def.'s Mem. Ex. 26-32, 38-39; this establishes all three prongs of prima facie test on the basis of her personal knowledge and testimony;

(zz) But the analysis does not end there; once the plaintiff has establish the prima facie case, the defendant may articulate a nondiscriminatory reason for the termination, McDonnell-Douglas at 802; here, NBME stated that its reason for terminating Rosetsky fell broadly under the rubric of insubordination; NBME's official stated reason was that Rosetsky was "not interested in performing the duties of a Program Assistant as defined by NBME," Def. Mem. Ex. 39; NBME also points to various directives which Rosetsky failed to follow, such as Rosetsky's not complying with Holtzman's request to keep a daily log, id. Ex. 23, 24; she continued to discuss her problems with Holtzman with co-workers after being told to cease doing so, id. Ex. 27; and she failed to address her issues with Holtzman in a

"nonconfrontational manner" by continuing to spar with her

supervisor over longstanding problems, id. Ex. 31, 38;

(aaa)  Once the defendant has offered a

nondiscriminatory reason for terminating the plaintiff, the

burden shifts back to the plaintiff to show the proffered reason

is a pretext, McDonnell-Douglas at 804; the plaintiff can do this

by pointing to evidence from which a reasonable fact-finder could

either "(1) disbelieve the employer's articulated legitimate

reasons; or (2) believe that an invidious discriminatory reason

was more likely than not a motivating or determinative cause of

the employer's action," Fuentes v. Perskie, 32 F.3d 759, 764 (3d

Cir. 1994); under the Fuentes test, the evidence plaintiff

proffers must meet a heightened "level of specificity" to survive

summary judgment. Simpson v. Kay Jewelers, 142 F.3d 639, 646 (3d

Cir. 1998); if the plaintiff satisfies either prong of the

Fuentes test, she survives summary judgment. Keller v. Orix

Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997) (en

banc);

(bbb)  Rosetsky asserts that NBME's reasons could be

found to be "unworthy of credence" because the defendant has

failed to specify any acts that amount to insubordination, Pl.'s

Mem. at 10 (citing Fuentes, 32 F.3d at 765);

19

(ccc)  "Insubordination" is "[t]he fact or condition of being insubordinate; absence of subordination or submission; resistance to or defiance of authority; refusal to obey orders; refractoriness, disobedience," VII <u>Oxford English Dictionary</u> 1053 (2d ed. 1989); Holtzman and Davidson asked Rosetsky to keep daily logs, cease discussing certain issues with other NBME staff, and address issues without being confrontational, each of which she refused and failed to do, and this constitutes insubordination;

(ddd)  Rosetsky responds in part to NBME's three examples of her insubordination;

(eee)  Rosetsky testified that she did not keep daily logs and reconstruct the amount of time she allotted to various projects because she had not kept nor was required to keep contemporaneous records of the time spent on her activities and her coming up with a task by task time breakdown would be "impossible," and that it was a "ridiculous request," Pl.'s Dep. at 283-86; however, Holtzman's initial request was for her to keep such records "from here on out" and had Rosetsky started when told she would not have had to reconstruct her time records for weeks in the past, Def. Mem. Ex. 23;  she failed to follow her supervisor's orders when she did not start keeping the daily logs of her work, and this amounted to insubordination;

20

(fff)   Rosetsky also continued to discuss her problems with Holtzman with her co-workers, specifically with Faith Balsama, id. Ex. 27; Rosetsky contends that this kind of treatment amounts to "elementary school" and she should not be subject to it, id. Ex. 31; regardless of whether or not the players in this drama were acting like children, Rosetsky was told not to discuss this matter with others in the department but she did anyway;

(ggg)   Finally, Rosetsky claims that she continued to complain to Holtzman and Davidson because she was merely "expressing her frustration with Defendant's refusal to permit Plaintiff to perform her job," Pl.'s Mem. at 11; but her employer specifically asked her to address her issues in a "nonconfrontational manner;" the record clearly establishes that the growing animosity between Holtzman and Rosetsky was affecting the work environment, yet Rosetsky persisted in waging a pitched battle against Holtzman's treatment of her, ceaselessly confronting Holtzman whenever Rosetsky perceived a slight;

(hhh)   Neither the ADEA nor the PHRA gives employees a right to have a decent boss, let alone a likeable one; one may look upon Holtzman's behavior as reprehensible, belittling, or, overall, bad management, but none of these violated Rosetsky's

21

rights under the ADEA or under the PHRA;

(iii)  Furthermore, Rosetsky offers no other proof that NBME's proffered reasons are pretext; in fact, her entire argument relies on pointing to these proffered reasons and saying they are lies; but at this (late) stage of the litigation, the plaintiff must do more than that; she must provide "specific facts" for why a reasonable factfinder could believe the proffered reasons are false, <u>see</u> Fed. R. Civ. P. 56(e); she fails to do so, and, therefore, we must grant summary judgment to defendant on this claim as well;

(jjj)  As we have resolved the questions relating to summary judgment, we do not reach any of the other issues raised in defendant's motion;

It is hereby ORDERED that:

1.    Defendant National Board of Medical Examiners of the United States of America's motion for summary judgment is GRANTED;

2.    The Clerk of Court shall CLOSE this case statistically.

BY THE COURT:

/s/ Stewart Dalzell, J.

22

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DIANE ROSETSKY                :  CIVIL ACTION
                              :
        v.                    :
                              :
NATIONAL BOARD OF MEDICAL     :
EXAMINERS OF THE UNITED STATES :
OF AMERICA                    :  NO. 07-3167

<u>JUDGMENT</u>

AND NOW, this 19th day of February, 2008, in accordance

with the accompanying Order in which the Court granted

defendant's motion for summary judgment, JUDGMENT IS ENTERED in

favor of defendant National Board of Medical Examiners of the

United States of America and against plaintiff Diane Rosetsky.

BY THE COURT:


<u>/s/ Stewart Dalzell, J.</u>